Good morning. May it please the Court. I'm Michael Sorgin and I represent Adam Mullin and the Mullin family. My co-counsel Carl Briggs is here as well. I think the parties agree, at least on one thing, that there are two issues on this appeal. The first issue, which we might articulate differently, but I would articulate it in this way. It's whether this case should be retried against the school district, which was accorded, which wasn't part of the first trial because it was accorded under 11th Amendment state sovereign immunity under the Bellinger precedent, which, at the very least, does not apply to the basic aid districts in California. And the Las Lomitas School District is a basic aid district. Was there any reason why the parents didn't bring suit? Was there any reason why the parents didn't bring suit on behalf of their children? Well, the parents are the guardians ad litem in this case. But it was the children who were subject to retaliation in the schools, in the school, as a result of their parents complaining on their behalf. Why didn't the parents bring suit to deal with the problem about them not getting into school or being kept out because one of their children was ill? Why didn't they undertake that burden? Well, we thought the claim the claims belonged to the children, and the parents were their guardians ad litem. And the claims of the children were that of Adam is the only one that's relevant on the appeal, is that the school district and its officials retaliated against Adam. Didn't Adam have one of the causes of action that Adam had was to sue on behalf of his parents in the validation of their rights? Am I saying it wrong? If I am, please correct me. I don't believe that was the cause of action. On the record, it appears that way. Maybe you could clarify me here before you – I know you want to get to the – I didn't even mention that. But this is an interesting issue here, and it relates to the jury instructions as well. But I understood that the son, the child, was not trying to sue to vindicate the parents' rights. That's exactly right. So there was no – we don't have the issue of third parties standing here. Well, the son – In the classic sense. This is – if we could look at the – As I understood it, the approach from the district court and your approach, I don't know kind of what the theory was, was that the parents' speech, that the parents' – the parents were – the parents' speech was really for the child. Right. The parents spoke out on behalf of the children. Right. So the protected speech of the parents was really the speech of the child. It should have been imputed to the child because the child was subjected to retaliation. Okay. Now, what's the best case that – in the Ninth Circuit that supports that proposition? Well, the – Do we have any Ninth Circuit cases that sort of deal with this? Well, you know, in fact, it's kind of ironic, but we have the wisdom of the Eastern District of Pennsylvania. Judge Brody? Sorry? Is that Judge Brody in the Eastern District? Right. The Serena H. case. And that's very much like this case. There the mother complained about the mistreatment of the child in the county's foster care facility, and the child was the subject of retaliation. This is a classic. And then there's also the Southern District of New York case, which is called Dangler, where the father, in that instance, was the one who complained, and the child was basically not allowed to be part of the National Honor Society. And this is kind of the classic third-party retaliation because it's the parent who speaks out on behalf of the children if something terrible is happening at the school, such as a hostile environment based on religion, which was what these parents perceived was happening. And now the school is not in a position to retaliate against the parents. So naturally, if they're going to retaliate, the victim would be the child. So it's a very – it really does stand on all fours with the Serena H. and the Dangler case. That's the Eastern District of Pennsylvania. And with due regard to the Eastern District of Pennsylvania, how about the – I'll forgive you today. How about the Ninth Circuit? Well, there isn't a Ninth Circuit case. There is a – How about the Supreme Court? There's a Second Circuit case called Camacho, where the victim of the retaliation claimed that he was retaliated against not because of what he did or said, but because he was the aide to a dissident city councilman. That's the Camacho case. So why should we allow the – to ground this – the parents' speech and attribute it to the son? Is that because the content of the speech, it was protected? And if he had said these words, looking at this – If he had said these words, we wouldn't have this discussion. Well, he was in the fifth grade. He was 11 years old. So, I mean, normal – this is the – looking at it in a practical sense, if something awful is going on in the school, I mean, a child that young might not even tell the parents. And, you know, you have – if the parents, you know, perceive something like that, then their natural response is going to be to complain on behalf of the children, try to rectify the situation. There's no justification. I thought in this case the – it was presented on the basis that, indeed, he had squawked to his parents, and his parents had, in some sense, squawked on his behalf to the school. And so, truly, their speech was his speech. They were like an amanuensis in a sense. I don't recollect from what's in the record as to what Adam or Mark actually told their parents. So I'm sorry I can't respond to that question. But, I mean, the real question on this appeal, of course, I guess that's the fundamental – Right, that's correct, because the district court proceeded along the lines of your approach and assumed that that was correct. But when I read the record and, you know, read the briefs, I just thought to myself, hmm. We have to answer this – we have to answer this basic question first. So, number one, it makes sense. Number two, there's no precedent to the contrary. And number three, we have the Second Circuit, the Southern District of New York and the Eastern District of Pennsylvania. And there's no reason for the Ninth Circuit, addressing this question as a matter of first impression, not to follow that principle. Then there's the issue, which I was going to articulate the issue without even getting to that fundamental question, was whether the jury was misled. Because the question that the jury had to answer, the special verdict form, was basically whether Adam was retaliated against because of Adam's own speech. Well, here's the – I understand your question about the instructions. What – your argument about the instructions, I mean, you've made it pretty clear. What's difficult in coming to grips with that is, well, two things. First one says to oneself, well, considering the way this case was tried and considering the evidence that was put on, what did people think they were in court for if it wasn't about what the parents said, about his having a right to pursue what the parents said? I mean, everybody's spinning their wheels. As you suggested a few minutes ago, nobody for a moment says that he got up and said anything to the school. So the question is, what are we here in court for? Everybody's wasting their time if the parent's speech is not attributed to him. The whole thing's a waste of time because everybody knows that he didn't say those things. So that's the first thing. When you say, well, the jury was misled, I mean, everybody must have been nuts. They didn't know what they were doing. The lawyers, the judge, the jury, nobody knew what they were there for because there was no evidence. Beyond that, the instruction itself says – don't the instructions say, look, plaintiff's made these allegations and his allegation is he engaged in certain speech. The next instruction says, in determining what plaintiff's alleged speech was, what alleged speech was protected, consider these three things the parents said. If you take the whole menu of this trial and you take those two instructions, I'm having a really hard time understanding why the jury was misled. I understand the jury didn't find it in your favor, but I'm having a hard time understanding why the jury just couldn't figure out what it was doing. Well, I've tried a lot of trials. A big, long speech, I know, but you know what I'm asking. Well, I can say that the jury was confused, and this is what John Scott, the trial attorney, was saying. He proposed a special verdict and an instruction number 44 that made it clear that the child was being retaliated because of the parent's speech. And now it's true that in instruction number 20, there's a list of certain types of speech that the parent's engaged in, but then there's instruction number 19, which talks only about the child's own speech. And I think most important is the special verdict, because that's the question the jury is directly asked to respond to. So you don't think the instructions are so bad, it's the verdict that bothers you? Well, the standard under Glover is you have to look at the whole thing. I'm just asking you my question. My question is do you think it's the verdict that's so bad? It's the form, it's not the instructions, because they shouldn't have been too confused by the instructions, right? The verdict is the confusion in the verdict is reinforced by instruction number 19, and it's mitigated somewhat by instruction number 20. That would be my take on it. Then there's all this discussion in the court, and there's all the discussion during the closing argument, and of course the judge must have told the jury that argument is only argument. But I think it's true. The jury didn't they were misled, they were confused, and they didn't know what they were doing. Now, you know, looking at this in another practical aspect, if we have a retrial against the district, which wasn't party to the first case, then this becomes less important anyway, because we're not going to have the individuals there. But I think with the guidance of this court that we can rectify this situation with regard to the trial against the district, that if the Ninth Circuit recognizes the legitimacy of this kind of third-party retaliation claim and follows the out-of-circuit precedent, then when the case is retried against the district, then the jury won't be so confused. So maybe that's a segue into the school finance issue, which unless the court has more questions on that. So I think the school finance issue, I mean, this is a very interesting case, I think, because it relies on Bellinger, which was decided in 92, and there's all kinds of in Bellinger itself the court said California selected a different path from that of most states. And Bellinger, the Ninth Circuit itself has struggled to distinguish Bellinger in the subsequent cases and has said that California has a unique system, or they talk about the system that existed at that time. And all of the subsequent Ninth Circuit cases, as well as one prior Ninth Circuit case, involving four other states within the circuit, Oregon, Nevada, Arizona, Alaska, come out the other way, that there's no state sovereign immunity. And, in fact, the seminal case is Mount Healthy v. Doyle, 1977 case, which is also a First Amendment retaliation case. And there it's assumed that the school district is local and that there's no state. I read the affidavits by the two experts and read the district court's orders, but the local tax money, when the district collects it, does it stay there in the county with the county board of education, or does it go to Sacramento? The school district collects that money so they can spend it on their children. The school district does not actually collect it. The county tax collector collects property tax money. And the county tax collector then distributes the money to the various sources, you know, cities and special districts and whatnot, to get their share of the money. With the school money, does it go directly to the district, or does it go to the state, or is it just in county? When we talk about this education fund, is it just sort of this accounting method? I think the important fact is that the money that's collected, the tax money that's collected for the Las Lomitas School District is local. It's not shared with any other school districts, because they have deliberately opted out of the revenue limit and the equalization program, which the state adopted essentially after Serrano and Proposition 13. And, of course, they do this because they want to spend a lot more money on the education of their children. And, in fact, the expert Guthrie says they spend two to three times as much as the average elementary school expenditure, and 44% more than the average general expenditure. Now, we're talking here about 60 districts out of about 1,000 in the state, and we're talking about their serving about 100, and this is all in the expert's declaration, 100,000 students out of about 6 million. Let me ask you this. If it just were a rare incident, they had a massive judgment against the district, and they had to spend their local tax dollars to pay that, could they get that adjustment from the state to equalize them? I think whether they could or not is irrelevant, just as the question of whether they're to the extent to which they're covered by their insurance joint powers agreement is irrelevant because the first Mitchell standard, the most important one as acknowledged by the court, has kind of evolved. It used to be a question of whether the district would draw from state funds to pay the judgment, what impact it would have on the state treasury. But now, according to Hulse and the Regents v. Doe case, the real question is whether the state is legally required to pay that judgment. It's the responsibility. So I'm not talking about the judgment. I understand that. In fact, there was a case out of the State Court of Appeals that sort of clarified how judgments are paid against school districts, and I can't think of the name of that case off the top of my head. But what I was concerned about is what happens if the district were to pay a judgment, which had the effect of reducing its available funds, it would take it down below what it's entitled to according to its revenue limit. I suppose in that circumstance, the district could make a strategic decision to opt into the revenue limit equalization program with the rest of the districts because it would no longer be ---- So the state wouldn't have those dollars to give to other districts. Is that correct? If the district opted back into the revenue sharing, which I assume they could. I think actually I don't see how one of these basic aid districts can be an arm of the state because the whole system represents a tremendous disparity in school finance, which the state itself can't do. And that's the point that's made in the Savage case. I was unaware of basic aid districts until I read this case. I had no idea that they even existed. I thought they were all equalized under Serrano, but, you know. What does opt-in and opt-out mean? Well, as I understand it ---- This is a practical matter. I mean, what does a district ---- I don't know of any basic aid district that ever has followed that strategy, you know, had such a large judgment against it that it subsequently became a revenue limit equalization district. But I suppose that the way they become basic aid districts is because they decide that they want to just use their local property tax and, you know, spend as much money as they can. Do they send a piece of paper into Sacramento and say, we opt out of your stinking program? I just don't know. Or is it just as an accounting matter, just as the way it figures out when the government's making its calculations is, oh, well, so-and-so got so much tax and, therefore, they only get so much money? Or is it really an affirmative act by the district saying, we don't want to be in your stinking program, and so we're sending in this piece of paper? I don't know how it comes about, but I do know that the basic aid districts are the rich districts, and there's no real rhyme or reason to it. And also, you know, this comment about the school finance law as it existed at that time, you know, there have been a lot of changes. When Bellinger was decided? When Bellinger was decided. Well, there have been a lot of changes in the school finance law. And I think that if you look at these other state cases like Holtz and Eason and Savage, you find that the ninth circuit has struggled a lot with the Bellinger case. But you don't have to go as far as to say Bellinger is invalid, although I believe it is, because all you have to decide is that it doesn't. But Bellinger clearly talks about the equalization and the state paying the money for the judgment, and they didn't contemplate the basic aid districts and may not have known about them at that time either. Thank you very much. Thank you. Good morning. I'm John Shoup. I represent the appellees in this case. I think that there's always good reason for a circuit court to avoid reaching a constitutional issue like the Eleventh Amendment if it can. So I'm going to start with those earlier propositions and issues that we heard your questions about earlier. And the first one you had questions about was standing. I do think that the closest ninth circuit decision we found regarding the standing issue is the Watson case. And that's mentioned in the brief. It's a little bit different, though, isn't it? Well, if you assume that the theory presented at trial was that Adam Mullen was trying to enforce his parents' First Amendment rights, then I think that that case applies, and the standing test in that case does apply. And the element which is not shown here and which I guess appellants are asking this Court to relax, I think that was the phrase used in the reply brief, that element is, is there some obstruction to the parents' ability to enforce their own rights? And there's been no showing on this record that there is. You have a minor here. And it is different, factually different from the Watson case. It is different. We haven't found, I haven't found in my research a case that's closer, however. And Watson does clearly state the test that applies to third-party standing situations. So I'm assuming that that's the test that's going to apply unless this panel decides otherwise. They haven't really presented a reason that I can see why that same three-part test should not apply. And, in fact, the out-of-district or out-of-circuit cases that were cited by appellant in their reply brief, they don't really abandon that test. The case they talk about most often, which is this Dangler decision out of a New York district court decision, in that case the district court decided that because the father's, that was the third party in that case, the father's claim would have no monetary value. That met the element of some obstruction to his pursuing the claim himself. There's been no showing here that that issue would apply. Those facts are in our record. There's nothing here to suggest that. So beyond the citing to these out-of-circuit cases, there's been no showing by appellant. And they do have that burden to show if they want to assert that kind of standing. Well, but if we decide this case on the basis that it was tried, and on the basis it was presented to the jury and to the court, why are we going there? Now, maybe you're going to convince me that this was so confusing that it should be overturned, but it looks to me when I read the record and when I read these instructions, the jury was told he's suing, and you have to find out did he engage in speech. And then it's told this is the speech that we're talking about, and that's these three items. So it looks to me like this is tried to the jury that it's his speech we're talking about, and whether it's good, bad, or indifferent law, the way everybody puts it to the jury is, here's the speech, here's Adam's speech that we're talking about. Am I wrong about that? No, you're not. I mean, I was there. That was how the case was tried. That was the theory of the case. So it puts the jury on that case. The jury has asked that question. Everybody's arguing that. Everybody knows that this is the speech we're talking about. It's put to the jury, and the jury rules. So I'm having a hard time understanding why we're now shifting ground and talking about something else. Well, one of the problems that an appellee has is it has to respond to the arguments made in the appellate's brief, and they styled their case as one of third-party standing on the idea that Adam Mullen was asserting the First Amendment rights or enforcing the First Amendment rights of his parent. You see, unless we go into the plain-error world, which I'm afraid sometimes we slip into, unless we start dragging the plain-error world, I have a sort of general feeling, if parties want to say to the court and the jury, this is how we're going to try this case, and this is the principle, and that's how it's instructed, and you get a ruling on that, it seems to me schools out, or should they, so to speak. Well, I won't repeat that turn of phrase, but as the trial attorney on the case, I can tell you that the judge indicated that in his view the speech of the parent was the speech of Adam, and that's how the case proceeded in trial, and the jury was told throughout the course of the trial by the argument, by the evidence presented, by openings and by closings, and by Instruction 20, that those categories of speech by the parent were the speech that mattered. That was the reason the jury was there. That was the reason we had a three-week trial, and I don't think there's any confusion about that. That's an issue, then, I hope I don't need to address further. If there are any questions about that one, I'll certainly try and answer them now, but if not, I'd like to turn to this other issue regarding mootness. That's how I describe it. Others might use a different label. That has to do with the fact that the jury did return a verdict finding that Adam Mullen had not suffered a constitutional injury at the hands of the school district employees who he contended had caused that injury. Now, that having occurred, it's our position that there's no reason to reach the Eleventh Amendment issue at all, the constitutional issue, because there's no constitutional injury left to assert against the school district as the employer of those individuals who allegedly caused that injury. I saw in the reply brief a statement by appellants. I was glad to see it. They do agree that if the jury determined there was no constitutional injury, then the school district can't be pursued further on an entity claim. There's a Supreme Court case that makes that point. It's the Heller case, City of Los Angeles v. Heller, and, in fact, it involved this circuit. After Heller, which ruled that in a false arrest and excessive force case, if the officers were found to not have done that by a jury on a general verdict form, the city can't be pursued for that on an entity theory. After that case, there's some Ninth Circuit decisions. Several of them just seem to apply. Heller, straightforwardly. Quintanilla and Scott v. Heinrich both seem to say the same thing as the Supreme Court said in Heller. There are some other cases which appellants cite which contain some more helpful language to appellants. That's the Chu v. Gates case primarily, and also Hopkins v. Andala. I think if you look closely at those decisions, they don't really undercut Heller. They don't really go off in a different direction. What they do is indicate if there are more than one constitutional injury out there that the case is talking about, if the jury verdict for the employees only deals with one constitutional injury, that doesn't take care of the second one, which might still be attributed to the entity. And I think the even later case of Dixon v. Willowa County, that's at 336 F. 3rd, 1013, a 2003 case, really pulls that together and makes it clear that you have to focus on the constitutional injury involved. In this case, in our case, the constitutional injury involved is retaliation, alleged retaliation for the exercise of free speech. There's no other constitutional injury in question. If you look at the way the pleadings go, and they are in the supplemental excerpts of record, if you look at the way the case was tried, that's the injury. The injury is retaliation for exercise of First Amendment rights, and that's the injury the jury decided didn't exist. It didn't occur. That being the case, there could be no entity claim left. This case does fall within the scope of the Heller decision. For that reason, there's no reason for this Court to reach for the Eleventh Amendment argument and issue that appellants are making. Having said all that, I'd like to address briefly at least these school financing questions, because I agree with counsel, they are interesting. Having read appellants' brief, it seems to me they're approaching the whole question the wrong way. They're approaching it by comparing the Las Lomitas School District with districts in out-of-state cases, with school districts in Arizona, Alaska, Nevada. Each state's school system is unique. The case which analyzes California's school system is the Bellinger case. There was discussion of that first. Bellinger is a close look at the California system of school financing, and why taking all those things together, it indicates that California public schools are arms of the state for Eleventh Amendment purposes. The better approach is to ask, is there something about the Las Lomitas School District in the record in this case, which makes it so different than other California public schools that it's not within the scope of Bellinger? I think that's the approach we need to take. To do that, we really need to take a close look at Bellinger itself. Now, in Bellinger ---- Before you go there, can you answer the question I asked your opposing counsel? He really didn't know, and maybe it's not in the record, so he can't know, but it seems to me to be in the California law. What in the world does opt-in, opt-out mean? A mischaracterization. It's a mischaracterization of the legal reality, and the legal reality is that school districts don't make decisions to opt-in or opt-out of the state financing system. All California school districts are subject to the same state financing system. The state has chosen to use local property taxes to meet the budget needs of school districts and to meet the revenue limit, which is the cap the state imposes in terms of what the state must provide each school district. The state legislature, by law, has said property taxes collected locally by the county, distributed to the various entities, can be used for that purpose. School districts don't make a choice. School districts have valuable real property around them or not so valuable real property around them. They have the advantage of local property taxes up to the revenue limit if they have that valuable real property around them. They don't have that advantage if they don't. That doesn't have anything to do with the decision. There's no conscious decision made. It's just a circumstance. All the school districts fall into – I couldn't tell from the statutes. I couldn't find the opt-out in language in the statutes. That's why I asked the question. Everybody just gets an accounting sheet calculated in Sacramento, and wherever it falls, that's where it falls. And if it turns out you've got a lot of tax, they're not going to send you very much money, and if you don't have a lot of tax, they send you a lot of money. Is that what you're saying? Yeah, that's what I'm saying. In fact, that's how the Bellinger Court described the system then, and that's still the system in place now. At the time this case, the summary judgment motion was decided, the Las Lomitas School District received around 90% of its general budget from local property taxes, and it still received the same basic school aid from the state, I think it's $125 per student, that every other school district does. Those funds were commingled in its budget. At the time Bellinger was decided, the Madera Unified School District, which was the school district in that case, received something on the order of around 20% of its revenue from local property tax and the balance from a combination of state and federal funds. So in Bellinger, the plaintiff's attorneys made the same argument that's being made by appellants here. They argued that because a judgment might be satisfied out of that share of the budget, which is local property tax, therefore, the school district is not an arm of the state, doesn't meet that Mitchell factor, they said. This circuit in Bellinger said that's an irrelevant argument. It said that's an irrelevant argument for three reasons. Let me see if I can get to them. One, the local property taxes and state money are commingled, and any use of commingled funds is a use of state funds, said the Bellinger court. That fact is no different for the Las Lomitas District when this summary judgment ruling occurred than it was for the Madera Unified District when Bellinger was published. I'm not sure they classify the local property tax as state money. Yes. Bellinger court clearly did that. It said that because the state has decided to use local property tax money to fill that part of the budget where it can, rather than send a check directly from Sacramento, it becomes state money for that reason. It's the state's power to control school financing and the state's power to decide when local property taxes should be used for this purpose or that purpose. So it's deemed state money. It's deemed state money. That was the holding in Bellinger. And that was the third of the three reasons the Bellinger court said this argument about, well, there are property taxes in the budget which might go to satisfy a judgment, said the court was irrelevant. You know, Cutler, I'm reaching back into antediluvian times. Those of us who were around when Serrano came down, I thought Serrano's point was that we're going to equalize all the stuff across California for all the districts so all the students are treated the same. It sounds like you're telling me California has found a way not to do that. Is that true? I'm not sure there's a conscious decision involved in that either. But I can tell you this, and it was a point I was going to make because I kept hearing Mr. Sorgen say things about wealthy districts, unequal treatment of students. This decision is not a vehicle to overturn Serrano v. Priest one or two. It's not a vehicle to undermine what some perceive to be inequalities in state financing caused by the fact that some districts reside in areas where property taxes are higher collectively because of the value of the property. That's not our case. And those kinds of thoughts have nothing to do with the Mitchell factors about whether the Eleventh Amendment applies or not. As I understand it, though, any revenue, local tax revenue that exceeds the revenue limit set by the state, you get to keep? The district gets to keep? Under my understanding of the system, and I'm not the best expert in California on this, but my understanding is that the school district, beyond the basic state aid of $125 a student, which comes from the state and is commingled with the property tax that local authorities at the county, the county tax collector distributes to the various entities, including the school district, its share of property tax. And that amount of money can exceed the basic revenue limit, and the school district can use that amount of money to They don't have to take that extra amount over their resource revenue limit, and it gets utilized around the state elsewhere. Kick it back to the state. Yeah, that doesn't happen. Well, that's a good point. We asked this Court to judicially notice something in connection with this hearing. We asked the Court to judicially notice an attempt by then-Governor Davis a year or two ago to take back that extra amount of property tax because he wanted to recapture that for other state purposes, perhaps other school purposes, perhaps other purposes. Now, the request for judicial notice has a copy of a document or two attached to it which show what the intent of that proposal was. Why did we ask for that to be judicially noticed? Because it illustrates the state's power to do that, and it's the state's power to do that which underscores why school districts in California remain agencies of the state. They are subject to the state's control over school finance. But the state hasn't done that here. The state didn't do that. The state did not do that. That was spent around in Sacramento and not passed. So the Las Lomitas School District is allowed to use that extra amount of money? It is so far as I understand the system. Well, that's what I understood from reading the expert's affidavit. I mean, he says that the average amount of dollars spent per child in the district is quite high compared to the average spent across the state. That is an advantage that local school districts have when property values around them are higher, and it has nothing to do with a conscious decision to opt in or opt out. That's a complete mischaracterization. The important point is, however, in terms of the Mitchell factors and whether Ballenger should remain the law, and I'll take him out of his statement that he's not asking you to throw Ballenger out. He's asking you to carve out an exception to Ballenger for the Las Lomitas School District. The important point there is that the Ballenger analysis comparing the Madera Unified School District with the Las Lomitas School District at the time the summary judgment motion was decided, you still got a school district that has local property tax commingled with state funds, and therefore the Ballenger analysis applies across the board. All three of the reasons the Ballenger court said were lying on the, gee, it's local property tax that might. Well, the commingling is with the basic aid. Is that what you're saying? Yes. And at the time this summary judgment motion was decided, that certainly was the case. That's explained in the record. It's in the supplemental record of the declaration of the superintendent, for instance, of the school, which is at sup ER 300 to 303. If there are no further questions, I have nothing more to say. Okay. Thank you. Thank you. You had about a minute. I have lots to say, actually. Well, I've got a minute. Okay. Thanks. Okay. It's not a question of state control. The district has the burden to show that the state has the liability to pay the judgment. Highland, Eason stand for that principle. If it's important whether there's a conscious decision to opt out, we could do further briefing or have an opportunity to check the record, write a letter to the court. This case is not moot because, and the jury did not determine that Adams suffered no constitutional injury. The jury merely determined that none of the individual defendants was liable for the retaliation. And if you look at Owen v. City of Independence, there they talk about a systemic injury. The Supreme Court, 1980, not the result of the conduct of any single individual, but the interactive behavior of several governmental officials, each of whom may have been acting in good faith. Similarly, in the Ninth Circuit, there are two good cases on this. There's the Fairley case where a person was held 12 days for an outstanding warrant of his twin brother, and the court per curiam said he was deprived of his liberty not as a result of the individual officer's conduct, but the collective inaction of the Long Beach Police Department. And then in the Gibson case, Judge Berzon spoke for unanimous court and said there could be a constitutional violation even if the individual officers are exonerated. And then my last ‑‑ Make it quick. Okay. My last point is there also is a motion to strike which the court submitted, and I don't think it needs any further discussion at this time. All right. Thank you. Thank you. Thank you. Appreciate your arguments. All right. The matter will stand ‑‑ will stand submitted. Thank you.
judges: Fernandez, Paez, Weiner